UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN O'FLAHERTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-02400-TWP-MG |
| | ) | |
| ASCENSION HEALTH IS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment, (Filing No. 39), filed by Defendant Ascension Health IS, Inc., d/b/a Ascension Technologies ("Ascension"). Following his termination, Plaintiff John O'Flaherty ("O'Flaherty") initiated this action against his former employer, Ascension, alleging violations of the Americans with Disabilities Act ("ADA"), as amended, the Family and Medical Leave Act ("FMLA"), as amended, the Age Discrimination in Employment Act ("ADEA"), and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended. O'Flaherty has since abandoned his claims under the ADEA and Title VII (Filing No. 35 at 2). For the following reasons, Ascension's Motion is **granted**.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to O'Flaherty as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.     O'Flaherty's Employment with Ascension

Ascension provides healthcare information technology ("IT") services to healthcare providers (Filing No. 41-1 at 2, ¶ 4; Filing No. 41-7 at 2, ¶ 4). Its Clinical Imaging division

provides IT support for clinical imaging systems like x-rays, MRIs, CT scans, and echocardiograms (Filing No. 41-1 at 2–3, ¶ 5). The division implements, upgrades, and maintains the hardware and software used to store and access patient imaging records. *Id.* at 3, ¶ 6.

O'Flaherty began work for Ascension in 2010 and has worked in various roles (Filing No. 39 at 3). From June 2018 until his termination in October 2019, he served as Ascension's Senior Director of Clinical Products, overseeing (in relevant part) Ascension's Clinical Imaging division (Filing No. 41-2 at 41–45).

Beginning in June 2018, O'Flaherty reported directly to Vice President of Clinical Products, Mary Kay LaChance ("LaChance"), who in turn reported to Vice President of Applications and Platforms, Tim Kessler ("Kessler") (Filing No. 41-2 at 41–45). O'Flaherty supervised Director of Clinical Imaging, John Choriatis ("Choriatis"). *Id.* at 47–49. Several personnel changes occurred a few months later. In February 2019, O'Flaherty terminated Choriatis and temporarily assumed his duties. As a result, all Clinical Imaging employees began reporting directly to O'Flaherty. *Id.* at 52–55. On June 30, 2019, Richard Adams ("Adams") replaced Choriatis as Director of Clinical Imaging. Adams had worked for Ascension for 20 years but never as a director (Filing No. 41-3 at 6–7). LaChance and Kessler also left Ascension that year, and by September 2019, Dr. Joyce Anne LeMaistre ("LeMaistre") had become the Vice President of Applications and Platforms and O'Flaherty's direct supervisor (Filing No. 41-1 at 3, ¶ 7; Filing No. 41-2 at 166; Filing No. 41-4 at 10). LeMaistre reported to Vice President and Chief Information Officer Gerry Lewis ("Lewis") (Filing No. 41-1 at 4, ¶ 11).

**B.    The Consolidation Project**

The event leading up to O'Flaherty's termination was an unsuccessful database consolidation project. For years prior to O'Flaherty's termination, cardiologists at two of Ascension's affiliated healthcare facilities in Indianapolis, Indiana had complained of cross-

functionality issues with Ascension's software platforms (Filing No. 41-5 at 2, ¶ 3). Each facility used a different Ascension platform with a separate database to manage imaging records, so one facility could not always access records of an imaging performed at the other facility and stored in the other database. *Id.* By June 2018, Ascension had begun exploring resolutions and had considered consolidating the databases (the "Consolidation Project") (Filing No. 41-2 at 66–67, 179–82).

Although Choriatis had primarily been responsible for the Consolidation Project before his termination, O'Flaherty sent or received several emails between June 2018 and February 2019 about the Consolidation Project (Filing No. 41-2 at 100, 179–190). Rachel Brewton ("Brewton"), an IT Manager in Clinical Imaging, had also been involved in the Consolidation Project since at least June 2018 (Filing No. 41-2 at 179–182). As part of the Clinical Imaging team, Brewton reported to O'Flaherty (Filing No. 41-7 at 1, ¶ 3; Filing No. 41-8 at 15). After Choriatis' termination in February 2019, O'Flaherty began meeting individually with his divisions' managers, including Brewton, every week and with his divisions' teams twice per week (Filing No. 41-2 at 105). Brewton understood the Consolidation Project to be a part of a Windows update, although O'Flaherty understood them to be separate projects (Filing No. 41-2 at 91; Filing No. 41-8 at 20).

In late February 2019, O'Flaherty believed that the Consolidation Project had "stalled" and that the Clinical Imaging team would be proceeding with only the Windows upgrade (Filing No. 41-2 at 106). According to O'Flaherty, Kessler communicated to the Clinical Imaging managers, including Adams and Brewton, to perform only the Windows upgrade. *Id.* at 108–09. After February 2019, O'Flaherty knew nothing of the Consolidation Project's progress. *Id.* at 110–116.

Nevertheless, the Consolidation Project proceeded.[1]  Without O'Flaherty's knowledge, and in apparent contradiction to Kessler's directive, Brewton managed a team that completed the Consolidation Project (Filing No. 41-8 at 31–32, 44; Filing No. 41-5 at 4, ¶ 5).[2]  On or around October 15, 2019, Ascension rolled out the consolidated database (Filing No. 41-1 at 3, ¶ 8; Filing No. 41-8 at 26).  The database immediately caused severe problems for the affected healthcare providers, including extreme slowness, which caused providers to cancel appointments, and mix-ups in patient imaging records, which threatened patient care and safety.  *Id.*  The database took approximately one year to completely fix (Filing No. 41-8 at 22).

**C.**     **O'Flaherty's Termination**

Following the Consolidation Project's rollout and ensuing problems, Ascension flew personnel from across the country into Indianapolis to assist with remediation efforts (Filing No. 39 at 7).  LeMaistre was on vacation during the rollout and would not return until October 21, 2019, but Vice President of Relationship and Demand Management Meghan Hendricks ("Hendricks"), and Vice President of Enterprise Services and Data and Chief Data Officer Rick Howard ("Howard") assisted in the remediation (Filing No. 41-1 at 3, ¶ 9; Filing No. 41-4 at 13).

---

[1] The parties dispute several details about the Consolidation Project's proposal, approval, and funding (Filing No. 57 at 5–7), but those facts are immaterial to the Court's decision.  Fed. R. Civ. P. 56(a).  As will be discussed, Ascension's proffered reason for O'Flaherty's termination was his failure to meet Ascension's legitimate expectations by having no knowledge of the Consolidation Project—not by proposing, approving, or funding it.  Details about the Consolidation Project's origins are therefore not determinative of whether the reason for O'Flaherty's termination was discriminatory, retaliatory, or pretextual.  *See, e.g., Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005) ("An issue of fact is "material" if it is outcome determinative . . . .").

O'Flaherty also contends "[t]here is no evidence the project 'moved forward' after March 21, 2019," (Filing No. 57 at 7).  O'Flaherty does not dispute the fact that the Consolidation Project was ultimately completed and rolled out, so the fact that the Consolidation Project proceeded after March 21, 2019, (despite O'Flaherty's knowledge) is beyond genuine dispute for purposes of summary judgment.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (stating courts should not adopt one party's version of events "blatantly contradicted by the record").

[2] O'Flaherty disputes that Brewton managed a team to work on the Consolidation Project (Filing No. 57 at 8), but he offers no evidence genuinely disputing this fact. O'Flaherty admittedly had no knowledge of the Consolidation Project after February 2019, so his knowledge about Brewton's role is speculative.  *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 931 (7th Cir. 1995) ("Speculation does not create a *genuine* issue of fact . . . ." (emphasis in original)).

On October 21, 2019, Hendricks met with O'Flaherty and learned of his noninvolvement with the Consolidation Project (Filing No. 39 at 7). LeMaistre returned from vacation on October 21, 2019, and on October 22, 2019, she attended a teleconference with Lewis, Hendricks, Howard, O'Flaherty, Adams, and others to discuss the failure and remediation efforts (Filing No. 41-1 at 4, ¶ 11). During the meeting, LeMaistre learned that O'Flaherty had no knowledge of the Clinical Imaging team's work on the Consolidation Project, and as a result, did not direct the team; ensure the team followed Ascension's standard processes; implement a formalized test plan; or check Ascension's outside vendor's work for quality control, all of which LeMaistre would have expected O'Flaherty to do (Filing No. 41-1, ¶¶ 11–12; Filing No. 41-4, 20–23).

Also during the October 22, 2019 meeting, Ascension leadership asked the Clinical Imaging team if the new database had been stabilized and if certain issues identified by cardiologists had been remediated. Adams answered "yes," and O'Flaherty agreed.  (Filing No. 41-1 at 22.)  Later that evening. LeMaistre and others met with cardiologists who stated the system was not yet stable or working well (Filing No. 41-1 at 22–23). LeMaistre believed O'Flaherty had known about the ongoing issues but had failed to report them to Ascension leadership (Id.).

Following the October 22, 2019 meeting and observations of O'Flaherty's remediation efforts over the next few days, LeMaistre determined O'Flaherty should be terminated for his unawareness of the Consolidation Project and failure to manage it (Filing No. 41-1 at 4, ¶ 12; Filing No. 41-4 at 20–24, 53–54). Lewis also shared with LeMaistre his independent recommendation that O'Flaherty should be terminated for a failure to provide leadership and oversight (Filing No. 39 at 9; Filing No. 41-4 at 25–26; Filing No. 41-5 at 3, ¶ 9). On October 22, 2019, LeMaistre asked Hendricks and Howard to prepare summaries of their observations of O'Flaherty's performance, which they provided on October 28, 2019. Id. at 10; Filing No. 41-4 at

24–25, 45. LeMaistre reviewed the summaries before O'Flaherty's termination although she based her decision on her independent knowledge and observations (Filing No. 41-4 at 53, 60).

LeMaistre traveled to Indianapolis on October 29, 2019, and scheduled an in-person meeting with O'Flaherty for October 30, 2019 (Filing No. 41-4 at 17). By that time, LeMaistre had already decided to terminate O'Flaherty's employment (Filing No. 41-4 at 56). On October 30, 2019, LeMaistre informed O'Flaherty he was being terminated for his lack of knowledge of and failure to manage the Consolidation Project (Filing No. 41-2 at 171). Hendricks was not disciplined related to the Consolidation Project, but LeMaistre disciplined Adams, and Adams disciplined Brewton, although neither was terminated (Filing No. 41-3, 28–32, 65–66; Filing No. 41-4 at 26, 28; Filing No. 41-8 at 30–31).

### D.     O'Flaherty's Disability and FMLA Leave

O'Flaherty's present disability stems from an earlier surgery.  In 2015, he underwent gall bladder surgery at an Ascension facility, complications from which left him in a medical coma (Filing No. 41-2 at 31–32). The surgical complications required O'Flaherty to undergo further surgery later in 2015 and July 2019, and O'Flaherty ultimately developed a severe liver condition called hepatic encephalopathy, his disability.  *Id.* at 129, 162.  O'Flaherty requested, received approval for, and took FMLA leave immediately following the initial surgery in 2015 and following the two additional surgeries in 2015 and July 2019.  *Id.* at 33, 35.  After each of those three leaves, O'Flaherty returned to Ascension in the same role and with the same compensation and benefits as before his leave.  *Id.* at 31–38.

O'Flaherty submitted the FMLA request at issue to Ascension's third-party FMLA administrator on October 21, 2019, amid the remediation efforts.  *Id.* at 147.  That day, LeMaistre received an email from the administrator notifying her of O'Flaherty's request but not the reason for it, except that it was "for Employee Medical" (Filing No. 41-4 at 38, 63). O'Flaherty was

notified by the administrator that he had satisfied the basic requirements for FMLA leave and could begin submitting scheduled absences for the FMLA leave, pending approval.  On October 30, 2019, O'Flaherty submitted a notice of absence for November 5, 2019, to the administrator. The administrator emailed O'Flaherty's notice to LeMaistre that day (Filing No. 41-4 at 41–42). O'Flaherty's request for FMLA Leave was ultimately approved, but not until after his October 30, 2019 termination (Filing No. 41-2 at 39–40).

Before her meeting with O'Flaherty on October 30, 2019, LeMaistre did not know about O'Flaherty's liver condition and did not know the reason for his October 2019 FMLA request, except that it was for a "medical" reason (Filing No. 41-1 at 4, ¶ 16). At the time Lewis concluded O'Flaherty should be terminated, he had no knowledge of O'Flaherty's disability or that he had submitted the October 2019 FMLA request (Filing No. 41-5 at 3, ¶ 10).

## II.   <u>LEGAL STANDARD</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of

proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to O'Flaherty as the non-moving party and draws all reasonable inferences in his favor. *Bright v. CCA*, No. 10-cv-01690, 2013 WL 6047505, at *3 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* (citation and quotation marks omitted). Moreover, the Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

## III.    DISCUSSION

Ascension seeks judgment as a matter of law on O'Flaherty's remaining ADA and FMLA claims, asserting that Ascension terminated O'Flaherty because of his mismanagement of a software project and not because of his disability or request for FMLA leave, and that there was

no interference or retaliation regarding his FMLA rights. O'Flaherty responds that he was not to blame for the Consolidation Project's failings, and Ascension's proffered reason for his termination is a pretext. The Court will address the two claims in turn.

**A.      ADA Discrimination Claim**

The ADA prohibits employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a); *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005). To support an ADA claim, a plaintiff must show, "(1) he is disabled within the meaning of the ADA, (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation, and (3) he suffered from an adverse employment decision because of his disability." *Pugh v. City of Attica*, 259 F.3d 619, 626 (7th Cir. 2001). Ascension does not dispute that O'Flaherty is a qualified individual with a disability under the ADA or that his termination was an adverse employment action.  As a result, the Court need only consider whether O'Flaherty can factually demonstrate that Ascension discriminated against him because of his disability.

An ADA plaintiff may prove disability discrimination by presenting direct evidence of discrimination, or he may prove discrimination indirectly using the *McDonnell Douglas* burden-shifting method.  *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) (citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)). Under the *McDonnell Douglas* method, a plaintiff may establish a *prima facie* case of disability discrimination by showing: "(1) he is disabled under the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably." *Dickerson*, 657 F.3d at 601. Upon such a showing, the defendant must "identify a legitimate, non-discriminatory reason for its employment decision," and if the defendant satisfies

this requirement, the plaintiff must then "prove by a preponderance of the evidence that the defendant's reasons are pretextual." *Id.*

Regardless of whether a plaintiff uses the direct method of proof, indirect method, or both methods to support his claim, the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Id.* The sole question that matters is whether a reasonable juror could conclude that the plaintiff would not have suffered the adverse employment action if he was not disabled and everything else had remained the same. *See id.* at 764; *Anchor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736–37 (7th Cir. 1994).

Ascension argues there is no evidence suggesting a discriminatory motive for O'Flaherty's termination. It asserts O'Flaherty has not identified similarly situated employees without a disability who received more favorable treatment, and that O'Flaherty did not meet Ascension's legitimate expectations by failing to have knowledge of or manage the Consolidation Project. Ascension argues that it offered a legitimate, non-discriminatory reason for terminating O'Flaherty's employment—his failure to meet its legitimate expectations—and that O'Flaherty cannot show the reason was pretextual. The Court will first discuss whether O'Flaherty had identified similarly situated employees outside his class who were treated more favorably, and then, because O'Flaherty's alleged failure to meet Ascension's legitimate expectations *is* the proffered reason for his termination, the Court will discuss the legitimate expectations and pretext

elements together. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 463 (7th Cir. 2014) ("In some cases . . . the issue of meeting legitimate job expectations and the question of pretext overlap. This is particularly true when the employer asserts as the nondiscriminatory reason for termination that an employee was not meeting legitimate job expectations.").

### 1.   <u>Similarly Situated Employees</u>

O'Flaherty identifies two potential comparators in his response brief: Hendricks and Adams. Although a similarly situated employee "need not be identical," such an employee must be comparable in all material respects. *Durkin v. City of Chicago*, 341 F.3d 606, 614 (7th Cir. 2003); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). "This typically means that the alleged comparator held the same type of job, reported to the same supervisor, was subject to the same standards and rules, had comparable experience and qualifications, and engaged in the same conduct without being subject to the same level of discipline." *Young v. Digger Specialties, Inc.*, No. 09cv136, 2010 WL 3940455, at *5 (N.D. Ind. Oct. 5, 2010) (citing *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692–93 (7th Cir. 2005)).  Additionally, when a plaintiff claims to have been disciplined more harshly than other employees, courts must consider whether the proffered 'similarly situated' employees had any differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.  *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 479 (7th Cir. 2010); *Antonetti v. Abbott Lab'ys*, 563 F.3d 587, 592 (7th Cir. 2009).

As an initial matter, O'Flaherty does not offer any evidence showing that either Hendricks or Adams are not disabled. For that reason alone, O'Flaherty has not sufficiently supported the element of a similarly situated employee to survive summary judgment. *See Rose v. Franciscan All. Inc.*, No. 16-cv-03212, 2018 WL 2688239, at *13 (S.D. Ind. June 4, 2018) (finding plaintiff's speculative evidence that comparator was not disabled was insufficient on summary judgment);

*see also Andrews v. City of Chicago*, 836 F. Supp. 2d 696, 700 (N.D. Ill. 2001); *Edwards v. Ill. Dep't of Fin. & Pro. Regul.*, 210 F. Supp. 3d 931, 948 (N.D. Ill. 2016).

However, even assuming Hendricks and Adams are not disabled, O'Flaherty would still be unable to carry his burden of showing they are proper comparators. Although Adams served in a supervisory role within Clinical Imaging like O'Flaherty, Adams was O'Flaherty's subordinate, had different responsibilities, and had far less managerial experience than O'Flaherty. (Filing No. 41-3 at 6–7, 11); *see Patterson*, 281 F.3d at 680 ("It is clear that Meyer was not similarly situated to Patterson because they reported to different supervisors and had different levels of experience and job responsibilities. The most significant fact distinguishing Patterson from Meyer is that, at the time of Patterson's termination, *Patterson was subordinate to Meyer on the task force*." (Emphasis in original.)).

Hendricks is distinguishable for similar reasons. She was the Vice President of Relationship and Demand Management—a more senior position than O'Flaherty's and in a different department (Filing No. 41-6 at 6). They did not share a supervisor or job responsibilities, so they are not comparable. *See Patterson*, 281 F.3d at 680. Further, O'Flaherty's contentions that Hendricks in fact approved the Consolidation Project and therefore should have been the one held accountable, even if true, speak to the fairness of Ascension's decision to terminate O'Flaherty instead of Hendricks, not the comparability of their roles. *O'Regan v. Arb. Fs., Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) (holding courts may not second-guess the prudence of employment decisions). O'Flaherty has not presented sufficient evidence to support the element of similarly situated employee on summary judgment.

### 2.   <u>Legitimate Employment Expectations and Pretext</u>

Ascension asserts the evidence shows LeMaistre and Lewis decided to terminate O'Flaherty because they honestly believed O'Flaherty exhibited "an overwhelming lack of

leadership and engagement and supervision" with respect to the Consolidation Project (Filing No. 41-4 at 26; Filing No. 41-5 at 3).  Ascension argues that although O'Flaherty may view its decision as unfair, the decision was not a pretext for discrimination. An employer can make mistakes or even act unfairly when making personnel choices while not being discriminatory in its decision-making. The Seventh Circuit has consistently held that the courts "do not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination."  *O'Regan*, 246 F.3d at 984 (quoting *Wollenburg v. Comtech Mfg. Co.*, 201 F.3d 973, 976 (7th Cir. 2000)).

In response, O'Flaherty argues Ascension's proffered reason for his termination was a pretext for discrimination. To establish pretext, O'Flaherty must show either that Ascension was motivated by a discriminatory reason or that Ascension's proffered reason is unworthy of credence. *See McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 372 (7th Cir. 1992).  In support of his pretext argument, O'Flaherty cites Ascension's "shifting explanations" of the Consolidation Project's proposal, approval, and funding and the "suspicious timing" between his request for FMLA leave and his termination (Filing No. 57 at 24–27).  This evidence does not carry O'Flaherty's burden on summary judgment.

    a.    **Statements About Consolidation Project's Origin, Approval, and Funding**

O'Flaherty offers evidence of inconsistencies in Ascension's explanation of the Consolidation Project's proposal, approval, and funding, and also offers evidence that he had no knowledge of or involvement in the Consolidation Project (Filing No. 57 at 26–27).  He argues this evidence shows Ascension could not have credibly believed he was to blame for the Consolidation Project's failure, so Ascension's proffered reason for his termination was pretextual *Id*.  This argument misses the mark.  Ascension placed blame on O'Flaherty not for his proposal

of, approval of, funding of, or any other role in the Consolidation Project, but for his total *noninvolvement*. And Ascension's belief is not unworthy of credence; O'Flaherty's concedes that he was not aware the project was moving forward and response brief relies heavily on his admitted lack of knowledge of the Consolidation Project. *See Widmar*, 772 F.3d at 465 ("[I]f [the employer's] legitimate expectation was that a plant manager not pass the buck, then [the plaintiff's] brief in which he repeatedly denies responsibility gives further weight to the conclusion that [the plaintiff] was not meeting his employer's legitimate expectations.").

O'Flaherty also offers affidavit testimony from former Ascension Director of Clinical Infomatics Carol Joseph ("Joseph"), which is either inadmissible or immaterial. Joseph's testimony that she told LeMaistre that O'Flaherty "'couldn't have known [the Consolidation Project] was being done,'" and that "[O'Flaherty] and Rachel Brewton didn't know" is inadmissible hearsay (Filing No. 57-16 at 3–4, ¶¶ 13–14). Fed. R. Evid. 702. Further, Joseph's testimony about what O'Flaherty or Brewton knew is beyond her personal knowledge. Fed. R. Civ. P. 56(c)(4); *see Jenkins v. Heintz*, 124 F.3d 824, 831 (7th Cir. 1997) (stating affiant cannot testify to another person's knowledge); *United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015) ("Testimony regarding the knowledge of another person based merely upon speculation is insufficient to demonstrate a genuine issue of material fact."). Joseph's remaining testimony as to whether the Consolidation Project should have been approved and who approved it is immaterial because the proffered reason for O'Flaherty's termination was his failure to realize the Consolidation Project was proceeding nonetheless. Fed. R. Civ. P. 56(a); *Harper*, 433 F.3d at 525. O'Flaherty's affidavit testimony about Joseph's statements to him is also inadmissible because it is hearsay (Filing No. 57-17). Fed. R. Evid. 702.

O'Flaherty's evidence does not cast doubt on Ascension's honest belief that O'Flaherty failed to be aware of or supervise the Clinical Imaging team's work on the Consolidation Project, thus failing to meet Ascension's legitimate expectations of a Senior Director of Clinical Imaging. This evidence may show Ascension's decision was unfair or unwise, but that does not make it discriminatory or pretextual. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge."); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 501–02 (7th Cir. 2004) (denying ADA and FMLA claims of plaintiff terminated after confrontations with workers, finding evidence that plaintiff was in fact not culpable for confrontations did not refute honesty of decisionmaker's belief); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007); *McCoy*, 957 F.2d at 373 ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions."); *Pugh*, 259 F.3d at 624 (denying ADA claims of plaintiff terminated for misappropriation of funds, finding evidence that plaintiff did not in fact misappropriate funds did not refute honesty of decisionmaker's belief).

**b.      Timing of O'Flaherty's FMLA Request and Termination**

Ascension argues the timing of O'Flaherty's termination was dictated by the timing of the Consolidation Project's rollout, not his FMLA request (Filing No. 39 at 22–23). O'Flaherty responds that the timing of LeMaistre's "increased scrutiny" of him and his termination suspiciously coincided with his request for FMLA leave and notice of FMLA absence, respectively, and shows pretext (Filing No. 57, 29–31). The Court agrees with Ascension.

Occasionally, very close timing between a protected activity and adverse employment action may, without more, support an adverse inference by a factfinder. *See Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011); *see Peele v. Burch*, 722 F.3d 956, 960 (7th

Cir. 2013) (finding that suspicious timing combined with evidence of political motivations to terminate plaintiff created a triable issue of fact). However, "suspicious timing alone is rarely enough to survive summary judgment particularly when there are reasonable, non-suspicious explanations for the timing of the termination." *McCann v. Badger Mining Corp.*, 965 F.3d 578 (7th Cir. 2020) (quotation marks and citations omitted). The evidence here, when considered as a whole, does not permit an inference of discrimination.

O'Flaherty does not dispute that the decision-makers regarding his termination were unaware of his disability until after his termination. Ascension leadership did not begin investigating the Consolidation Project until after its rollout on October 15, 2019. LeMaistre was on vacation at the time and would not return until October 21, 2019—the same day O'Flaherty initially requested FMLA leave. The timing of the rollout and LeMaistre's vacation reasonably explains why O'Flaherty received no scrutiny before October 21, 2019 (Filing No. 57 at 13).

On October 22, 2019, LeMaistre spoke with O'Flaherty, Adams, Lewis, Hendricks, Howard, and others about the Consolidation Project and learned about O'Flaherty's noninvolvement and observed what she believed to be dishonesty about the status of ongoing issues. She believed the information she gathered on October 22, 2019 would have warranted O'Flaherty's termination, but she decided to observe his remediation efforts for a few more days before making a final decision (Filing No. 41-4 at 53–54). In that time, she learned Lewis had reached the same conclusion and received feedback from Hendricks and Howard confirming her observations.  Soon afterwards, she made her final decision to terminate O'Flaherty (Filing No. 41-4 at 20–25, 56, 60).  LeMaistre made her final decision before October 30, 2019, eliminating any suspicion that the decision was influenced by O'Flaherty's October 30, 2019 notice of FMLA absence (Filing No. 41-4 at 56).  Moreover, LeMaistre did not know about O'Flaherty's liver

condition or the reason for his FMLA request beyond it being a "medical" reason, and Lewis had

no knowledge of O'Flaherty's disability or his FMLA request (Filing No. 41-2 at 149–51).

When the events of October 15–30, 2019, are viewed as a whole, the timing of O'Flaherty's

termination does not create a genuine issue of fact as to whether Ascension's proffered reason for

O'Flaherty's termination was pretextual.  *See McClendon v. Ind. Sugars, Inc.* ("*McClendon*") 108

F.3d 789 (7th Cir. 1997) (concluding timing of plaintiff's termination for insubordination three

days after filing a discrimination lawsuit was insufficient to show pretext in light of undisputed

evidence employer honestly believed plaintiff was disrespectful in two meetings with superiors a

week before and the day of his termination).

Because O'Flaherty cannot identify similarly situated employees who were treated more

favorably than he was and has offered no evidence that would permit a reasonable factfinder to

conclude Ascension's proffered reason was a pretext, O'Flaherty's disability discrimination claim

fails as a matter of law.   The Court **grants** summary judgment in favor of Ascension on

O'Flaherty's claim for discrimination in violation of the ADA[3].

## B.   ADA and FMLA Retaliation Claims

O'Flaherty also claims Ascension retaliated against him for requesting FMLA leave in

violation of both the ADA and FMLA. The ADA prohibits employers from retaliating against

employees who assert their rights under the ADA.  42 U.S.C. § 12203(a); *Dickerson*, 657 F.3d at

601. The FMLA similarly prohibits employers from retaliating against employees' use of or

attempts to exercise their rights to FMLA leave.  *See Goelzer v. Sheboygan Cnty.*, 604 F.3d 987,

---

[3] Ascension also argues that O'Flaherty's ADA claims fail because the decision-makers—LeMaistre and Lewis—did not have knowledge of his disability. Because the Court finds that the similarly situated employee and legitimate expectations/pretext issues are dispositive of O'Flaherty's ADA and his FMLA claims, the Court need not address that additional argument.

995 (7th Cir. 2010); *de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008). To establish a *prima facie* case of retaliation under either the ADA or FMLA, a plaintiff must show: (1) he engaged in statutorily protected activity; (2) his employer took an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Dickerson*, 657 F.3d at 601; *Freelain v. Village of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018).

The parties do not dispute that O'Flaherty's termination was an adverse employment action or that requesting FMLA leave is a protected activity under the FMLA. However, the Seventh Circuit has not yet decided whether requesting FMLA leave is a protected activity under the ADA. *See Arms v. Milwaukee Cnty. (Dep't on Aging)*, No. 18-CV-1835, 2019 WL 1981036, at *5 (E.D. Wis. May 1, 2019) ("The Seventh Circuit has left 'open the possibility that a brief period of leave to deal with a medical condition could be a reasonable accommodation in some circumstances.'" (quoting *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017))). The Court need not decide that issue here because the third element of O'Flaherty's retaliation claims is dispositive of his ADA and FMLA claims.

To succeed on the third element of his retaliation claims, O'Flaherty must show that his FMLA request was a motivating factor in Ascension's decision. *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022) ("[Plaintiff] does not need to prove that retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision." (emphasis in original) (quotation marks and citations omitted)). On summary judgment, the evidence presented by O'Flaherty must only support the inference that he has established a causal connection between his FMLA requests and his termination. *See id.* at 1307–08.

18

O'Flaherty's evidence of Ascension's "shifting explanations," his lack of knowledge of the Consolidation Project, and Ascension's "suspicious timing" does not permit an inference of a causal connection between his FMLA request and his termination for the same reasons it does not permit an inference of discrimination. The undisputed evidence shows that O'Flaherty requested, received, and used FMLA leave three times between 2015 and 2019 without suffering any adverse employment action (Filing No. 41-2 at 31–35). Further, his October 21, 2019 FMLA request was ultimately approved by Ascension's third-party administrator, albeit, after his termination (Filing No. 41-2 at 39–40). The evidence here does not permit an inference that O'Flaherty's FMLA request or his notice of absence was a motivating factor in Ascension's decision. Accordingly, the Court **grants** summary judgment in favor of Ascension on O'Flaherty's claims of retaliation in violation of the ADA and the FMLA.

**C.**     **FMLA Interference Claim**

O'Flaherty final claim is that Ascension unlawfully interfered with his use of FMLA leave. The FMLA prohibits employers from interfering with an employee's use of or attempt to exercise his right to FMLA leave. *See Goelzer*, 604 F.3d at 995; *de la Rama*, 541 F.3d at 686. To support an FMLA interference claim, a plaintiff must show: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 635–36 (7th Cir. 2009). The parties dispute only the last element.

An employer "may present evidence to show that the employee would not have been entitled to his position even if he had not taken leave; the employee then must overcome the employer's assertion." *Id.* at 636. As discussed above, Ascension has offered evidence that O'Flaherty would not have been entitled to his position had he not requested FMLA leave due to

his unawareness of the Consolidation Project and resultant failure to manage it. O'Flaherty has

not come forward with evidence permitting a reasonable inference otherwise. The Court therefore

**grants** summary judgment in favor of Ascension on O'Flaherty's remaining claim for interference

in violation of the FMLA.

## IV.   CONCLUSION

For the reason stated above, Defendant Ascension Health IS, Inc., d/b/a Ascension

Technologies' Motion for Summary Judgment (Filing No. 39) is **GRANTED**, and Plaintiff John

O'Flaherty's ADA and FMLA claims are **DISMISSED with prejudice**. Because O'Flaherty

abandoned his ADEA and Title VII Claims in his Statement of Claims, (Filing No. 35 at 2), those

claims are **DISMISSED without prejudice**.

Final judgment consistent with this Order shall now issue.

**SO ORDERED**.

Date:   5/18/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

20

DISTRIBUTION:

Christopher Lawrence Cassidy
CLEVELAND LEHNER CASSIDY
chris@clcattorneys.com

Eric J. Hartz
CLEVELAND LEHNER CASSIDY
eric@clcattorneys.com

Emily L. Connor
LITTLER MENDELSON, P.C. (Indianapolis)
econnor@littler.com

Alan L. McLaughlin
LITTLER MENDELSON, P.C. (Indianapolis)
amclaughlin@littler.com

Peter T. Tschanz
LITTLER MENDELSON, P.C. (Indianapolis)
ptschanz@littler.com